May it please the court, Cheryl Gordon-McLeod on behalf of Kalani V.E. I'd like to try to get to two related issues, if I can, this morning. The first one is the exclusion of the defendant, the defendant's counsel, and the public from the hearing on whether to disqualify his original lawyer, all because of a conflict with supposed government witness Boone. And the other issue, the related issue, is the Crawford error, because the government never ended up calling supposed government witness Boone. With regard to the first issue, the secret hearing that was conducted on January 25th of 2008, this is one that was prompted by public defender Ms. Boone's motion to withdraw. There was no dispute that this hearing was completely closed, closed to the public. The government acknowledges that a family member was escorted out of the courtroom. The court reporter says the courtroom was cleared, it was closed to the defendant, and it was closed to anybody representing the defendant. And I say that knowing that a first assistant from the federal public defender's office did go into the conference. But I think it's clear under Wadsworth, under Adelzo Gonzalez, and even under the Bradley case, that it doesn't matter if there's a lawyer in there who's not representing the defendant's own interests. That's not the defendant's lawyer. And in this case, the first assistant public defender was not representing Mr. Lee's desire that his lawyer stay on the case. You know, what is the right of Mr. Lee? He's being represented by a public defender or someone he's not able to choose and pay for his own counsel. So if the counsel that has been working with him and has been appointed, six months before the trial, says, I've got to withdraw because I have a conflict, how much more is the defendant entitled to know? And is he entitled to keep her as his attorney if she wants to depart? Well, I agree with your premise, no right to appointed counsel of choice. But the indigent certainly has a right to counsel. And the first complaint is that he was denied the right to counsel at this in-chambers hearing, just like in Wadsworth. But I guess I'm asking what rights could he have asserted there? The right that he could have asserted there was the right to, well, there's three rights that I want to talk about that a lawyer could have helped him with. The first would have been to advise him about the nature of the waiver so that Mr. Lee could have made a decision about whether he wanted to waive it. The second, and given this record for Mr. Kalani Lee saying, I trust this lawyer, she's helped me in the past, it's detrimental to my case to take her off, what he could have done was sought to waive the conflict. And I say that it's a waivable conflict based on, I think it was the Lewis v. Mealy case, which specifically said that this is a waivable conflict, representation of a conflicted witness can be waived, but it has to be knowing, intelligent, and voluntary. It has to be knowing and intelligent if he's not going to be told what the problem is, and it's apparent he's not going to be told what the problem is for some pretty good reasons. He's never asked to waive. You're presuming here that he has the right to waive. Is there anything that tells us he has the right to insist upon waiver, that the lawyer can't say, look, I've got a conflict, I'm not representing you anymore? Yes, in answer to all of your questions. First of all, let's make clear that the lawyer, his own lawyer, Ms. Byrne, never said I don't want to represent you. She said the first assistant told her that I can't. That's not her decision. Well, the conflict... I have lots of lawyers in my own law firm that are happy to say, I want to keep representing, and the firm has to say, no, we've got a conflict. That's true for the Office of the Federal Defender, too. Absolutely. But the Federal Defender also has a duty under Lewis v. Mealy to describe to the defendant the nature of the conflict so that the defendant can make a knowing and intelligent decision. Your premise is that the defendant has a decision to make. Yes. What tells me that the decision is in the hands of the defendant? What tells you the decision is in the hands of the defendant is this. In Lewis v. Mealy, that's a Ninth Circuit case from 2004, that was a case concerning waiver of prior representation of a witness and the only suspect in the case. Now, the court held in that case that the waiver of counsel was not sufficient because there was not enough information given to the defendant to knowingly waive the conflict. The necessary corollary is... That's a problem, though. Well, the necessary corollary is that if the defendant is given sufficient information and the defendant reasserts, this is my trusted lawyer, then he is entitled to have the district court judge exercise discretion. He doesn't have an unqualified right to keep... How is that a necessary corollary? Well, Lewis v. Mealy said that there is a right to waive the conflict of prior representation. Well, no, it said in that case that the waiver wasn't effective. That doesn't mean that there's necessarily always a right to waive. Well, it says that the waiver was not effective because it didn't meet the knowing, intelligent, and voluntary constitutional waiver standards. That still doesn't say anything as to whether you have an absolute right to waive. I don't assert that there is an absolute right to waive. I understand that under we, there's discretion about whether the judge has to accept the waiver. The defendant can certainly say, I waive it. The district court judge can say, in my exercise of discretion, like in Holloway v. Arkansas, it's just too tough, we can't do it. The judge in this case didn't exercise any discretion. First thing that happened is that the judge in open court said, conflict, okay, you've got to be off the case. The government attorneys... The magistrate judge who routinely appoints counsel can probably figure out what it means when the federal defender comes in and says, we've got a conflict. And one of the supervising attorneys comes in and says, we've got a conflict, judge. What's the magistrate judge likely to think? The government was the party that stood up and said, I think we need a little bit more than this on the record. And that was why they went into chambers. The only party that was represented was the government attorney. The first assistant said, look, there's this cooperating witness. Now, what was the big secret about not telling the defendant about it? The cooperating witness was Boo. Boo was on the tape. Boo did the transactions with Carice Stewart. Boo is the one who's in my opening briefs all over the place. Boo was listed on the government's... Boo was assumed to be a witness before they decided not to call him. There's no big secret. There's nothing about Boo cooperating that couldn't have been told to the defendant. The fact that it was as a result of a deal made with somebody that the Federal Public Defender's Office was representing was reflected in the plea agreement. Plea agreements are presumptively open unless there's a reason for sealing them from the public. If there was a reason for sealing this, then all they needed to do was not say what the name of the represented party was. But there was no big secret that needed to be kept from the public, the press, the family, or Mr. Lee because the fact of Boo being a supposed witness was known to everybody. So he certainly could have been told about it. A lawyer could have advised him about the conflict, could have argued in favor of waiver at this hearing, and a lawyer could have called out the government on its assertion that Boo is a necessary witness because as it turns out, about three months later, the government comes in and says, oh, we've decided we're not going to call Boo as a witness. We're simply going to rely on the tapes. So a lawyer, I think, had a large role to play in this and could have changed the outcome by advising, by asserting the waiver, by getting the judge to exercise discretion, and by pulling out the facts about whether Boo was really this necessary of a witness or whether this was not exactly the case. In a few minutes, you're going to tell us that Boo was a necessary witness. Yeah, but I just think you're spending a lot of time on a losing issue. Well, let me move to a winning issue then. What? Let me move to a winning issue. I've already wasted a few minutes. Take a shot. Crawford. I'm going to take a shot at Crawford, which is the first issue in the opening brief. Crawford, of course, bars admission of a non-testifying informant's statements at trial. Boo was the informant, and it was his taped statements that were introduced at trial, and they were taped statements that implicated Mr. Leahy. Now, the cases seem to divide the universe up into taped statements that are not testimonial because they're limited to supplying context, taped statements that are testimonial because they're more than establishing context. Here we've got the taped statements of Boo about at least eight different taped exhibits, and Carice Stewart is the one who's testifying about them. Stewart, for example, says, well, Boo said give me, quote, something, and he meant, quote, crystal meth. Carice says Boo said, quote, more better just let me talk to him, close quotes, and that him meant Kalani Leahy. And this is true for each of the eight different exhibits, tapes that she goes through. She keeps saying what Boo meant when he said stuff and each time it was crystal meth, and she keeps saying what Boo meant when he said let me talk to him, I want to talk to him directly, and that that was Kalani Leahy. Now, there's no other, let me talk about the evidence that was established. On the whole, we have a bunch of evidence that Boo and Carice Stewart had hand-to-hand transactions. There was videos, there was the drugs, and there was the money from these transactions. None of that establishes that Mr. Leahy was the source of the methamphetamine. Certainly there's circumstantial evidence that it was him. There's a license plate, and there's his presence at the Ala Moana Shopping Center. But no direct evidence. The only direct evidence that linked Mr. Leahy to this was the statements from Ms. Stewart, who took the stand, and Boo Kabuag, who did not take the stand. Now, let's look at Ms. Stewart. She was the jilted lover. She was the informant. She was the one who was carrying the grudge because she saw Mr. Leahy. I don't know why she was jilted. The record shows that she was in treatment and that she saw Mr. Leahy out with other women, while she couldn't do that because she was stuck in treatment, and there was testimony that there was some bitterness because of that. Boo is entirely different. His statements were contemporaneous with the sales. He was the one who named Kalani Leahy as the supplier, where Ms. Stewart would never use his name on the phone. He was the one who said crystal meth on the phone, where Ms. Stewart would never use that. He was the one who did the specifics on the phone because Ms. Stewart would never use the specifics. Boo's testimony, Boo's non-testimony, his statements, fall into a completely different category than the only other direct evidence of Ms. Stewart. And that is how the government used it. In closing argument, the government, and I'm referring here to excerpts of Record 216 and 217. Can you tell us why that tape was inadmissible? The tape was inadmissible because it contained statements from Boo, a cooperating government witness, and those statements implicated Kalani Leahy. He used Kalani Leahy's name, and he said, that's where I want to get my crystal meth from. It's like the cop saying, I got the 911 call, and instead of thereafter saying, as a result of the call, I did such and such, the cop says, and the 911 call said that so-and-so committed the murder, and I should go check it out. It specifically identified Kalani Leahy by name as the supplier of the crystal meth. And there was nothing else that did that directly other than Ms. Stewart's testimony. So I think the impact was great, and I think it was used as substantive evidence. Did you suddenly talk to Al on the phone? There was one conversation at Ala Moana with Leahy talking to Al on the phone and asking for his money after Stewart threw the methamphetamine into the car. Again, yes, that exists. It is not the direct evidence of a hand-to-hand sale that we have with Stewart and Boo. It's her explanation of what that meant and Boo's explanation. Didn't Al see the two of them driving off together? Yes, there was certainly, and there was a license plate number with Leahy on it at a different transaction. There was definitely circumstantial evidence. The Boo out-of-court testimony, though, was direct evidence, and I think it's in a different category. I'm running low on my time. I will reserve some. Sure. Thank you. May I please have a look? Let me ask you a question. The transcript with Boo that went in, on what basis? What rule in the federal rules of evidence? A rule that allowed a co-conspirator's statement into evidence, and those were co-conspirator's statements by Carice Stewart, a party to the conspiracy with a defendant to distribute and possess with intent to distribute methamphetamine, Your Honor. Of course, Boo was not a co-conspirator. That's correct, and Boo's statements were not offered as a co-conspirator, exception to the hearsay rule. They were offered, as I offered, as verbal acts, that is, offers to purchase methamphetamine from Stewart, and then her statements were offered as non-hearsay co-conspirator statements, and Boo's statements, as recognized by the district court, were simply as statements that were made in context. They were made in context, but they also contained direct damning evidence of Lee. I don't think any, I submit to the court that the statements that Boo made went and put Stewart, the co-conspirator statements, her replies into context, and that Boo's statements, I submit to the court, never mentioned Kaliti. They would ask questions about he, and then the questions that were asked of Stewart were proper questions. Who do you understand? Where's the rule that says you can bring all this stuff in to show context? The two cases that are cited is… I said where's the rule? The rule, well, I suppose it is a rule, a case law that allows, but I'm not so sure there is a rule that directly addresses that, Your Honor. It's case law that allows the court. They used to be, in the old days, when we took evidence in law schools, sometimes in some schools you don't have to even take evidence, and Professor McBain used to sort of smile about it, but they had this rule of res gestae. If it's res gestae, it comes in. If it isn't, it goes out. But that rule was discredited, oh, 60 years ago. Well, it's not raised in… I know, that's because no one really worries much about evidence anymore. There is support for allowing the statements of boo-in or an informant in the nature of providing context to the replies of a co-conspirator. That's the Whitman case that's mentioned, this court's case. There is also, I believe, a Seventh Circuit case that we mentioned. Excuse me, the Whitman case, I'm sorry, and the United States versus York case that we mentioned, which is a Seventh Circuit, 2009 case, and the defendant admits this, concedes these matters. They argue that it was not. Our position is we never argued it improperly. We never argued Boo's statements improperly, and this is a confrontation clause. If there is an issue or if there is… What purpose did you offer it? We offered it as verbal acts. That's what we argued, and the court recognized that it was statements that were simply made and provided, put it in context of the replies of Cooney Stewart, the co-conspirator's statement, and then that was admissible. We disagree with the petitioner's argument, excuse me, the appellant's argument that we argued it improperly. There is nothing in the record to show we did not argue it improperly. They argue that the government, in closing argument, made some reference to Boo's statements. We did not reference Boo's statements. We referenced that the case against the defendant was overwhelming, that there was a lot more, is what we argued, besides Ms. Stewart's testimony, and, in fact, there was, and the court is well aware of it. There was a surveillance statement. But you didn't need all this stuff anyway. I believe we do. Why? Well, it did. It was overwhelming evidence. Well, there was evidence besides... Why did you bring Boo on? Let him testify. It was a decision that was made that he would not be a good witness necessarily, Your Honor. He'd been involved in unauthorized, and unauthorized during the time he was assisting the FBI. He bought methamphetamine. He did not advise the FBI of that. He went back and bought methamphetamine and smoked methamphetamine with Ms. Stewart on one of the nights of the deal. That was in late November of 2006, and it was believed it was best to present the case... So he could have been badly impeached. He could have been impeached. So there was Ms. Stewart impeached. You protected him from impeachment. No, we thought it was just best to present the case with a tactical decision to present the case without two individuals that could have been impeached. We had Ms. Stewart. She was subject to impeachment as to prior bad acts, as to a prior conviction, as to a belief that she would lessen her sentence this way. There was substantial impeachment to her, and the defendant didn't testify, and he was apparently not believable. The jury was free not to believe him, and apparently they didn't. The case that we had showed a defendant and a cooperating individual that was recorded. The cooperating individual referred to the defendant by Kalani. I disagree with the statements of counsel that there was no mention of the defendant. The defendant's name was mentioned. She called him Kalani, and we would ask her when she testified, who did you mean when you were referring to Kalani, or who did you refer to? In fact, Judge Gilmore asked her, when you say Kalani and you mean the defendant, who are you referring to, and would you please say when you say he, who you mean for the record when you're referring to. And she mentioned it. It was Kalani Lee, the defendant. There were cell phone records that showed Kalani Lee. He was contacted immediately after. Immediately after Carice Stewart was talking with the informant. Carice Stewart talked to the informant on December 20th and said I'll have to check to see if he has the drugs ready for tomorrow. And when she got off the phone, by her cell phone records, when she got off her phone with Boo, the cooperating individual, the next call she made was to the defendant. That was on December 20th. And the next day was the deal at the Alamoana Shopping Center parking lot, where the defendant was seen driving Ms. Stewart in a rental car to the meeting, dropped her off, circled her around, told her to get back in the car, and sped off. And then got on the telephone, Carice Stewart's telephone, with the undercover officer, Deputy Sheriff Burt O'Connor, who is known as Al, was playing the role of an off-island drug buyer. And said, the defendant said to Al, I'm holding you responsible for the payment. So there was the defendant speaking with Al. He was seen, not only by Al, but by a number of surveillance agents in the parking lot.  to collect the money, because they owed, I think it was $18,000, for the several ounces of methamphetamine they supplied. And then prior to that, there was also another cell phone contact, in November 21st, I believe, where the defendant was meeting with the cooperating individual, and did a drug deal, had received money from the cooperating individual, left the presence of the cooperating individual, drove to her home, and as the way driving to her home, she called the defendant's cell phone, from her cell phone, by cell phone, we have the cell phone records, and submitted those into evidence. So that's... My notes to myself are that, Exhibit 6, in that, that Boone specifically named Lee. Now, am I wrong about that? I can't question that, Judge. I don't question that, if your notes say that. Exhibit 6 was a telephone call, on November 29th. That may have been a reference to him, Your Honor. I don't contest that, if that's in the record I don't have in front of me. Are you asserting that this was harmless error? Yes. And there was... What objections were made, to the introduction of these exhibits? There was an initial objection, to the introduction of the tape, and in particular, as to Boone's statements on the tape. That was argued before the District Court. We mentioned, as I've mentioned here before, our position that, the statements of the co-conspirator, exception brought in Stewart, Kareese Stewart's part of the tape, and that Boone's statements, on the tape, were not offered for the truth of the matter asserted, and the judge recognized that, questioned Mr. Ishabashian, defense counsel on that, and said, well they're not really offering the truth, isn't he playing a role, and isn't this just the fact, that he made these statements, and we argued, it was a verbal act, and the court mentioned that it was, to sort of put it in the context, the fact that they were... It was a verbal act, it was offered for the, it was offered as positive evidence. It was offered that they were interested... It's not impeachment. It was offered to show that the United States, through disinformant, was acting to buy, or interested in buying drugs, and the fact that then of course, that this was brought out, that it was brought out by the defense, in the cross-examination of the FBI agent, early on in the case, long before any tapes were played, that Boone had reported, to the FBI, that he believed, or that the defendant, was distributing drugs. That's why we argued, this was harmless air. This was raised initially, by the defense, in the cross-examination of the case agent, FBI agent Justin Stern, and that information was elicited, by the defense attorney. We did not make the argument, as to the statements of Boone, being offered as truthful, or for the matter asserted, that the defendant was involved in drug dealing, that the defendant was a drug dealer, that the defendant was assisting, or helping Ms. Stewart deliver drugs, and distribute drugs. We never made that argument. We didn't make that argument, in our closing argument. We never offered it for that. The court recognized it for that, and it was simply, as we said, for what was the replies, made by Ms. Stewart, when she met with Boone, and Boone was asking, if there were drugs available. That's our position, as it's harmless air. When you decided not to call Boone, it seems to me, there should have been a lot of, government head scratching, as to whether you should, put those exhibits in, or try to put them in. Our belief was, at the time your honor, that the status of the law, allowed us, the case law allowed us, that it didn't violate, the confrontation clause, the way we were offering them, and the way we handled them in court, it is still our position, that that did not, it was a tactical decision. That's correct your honor. If I'd like to just respond briefly, to the argument of the... Boone on your witness list... Initially he was, and we told the defense, we were not going to call him. When did you tell that? I think about, it was before the pre-trial conference, before the judge your honor, before Judge Gilmore, we told Mr. Shabash, we were doing that, we were not going to call him. I'd like to proceed a little bit, or mention a little bit, about the waiver issue. Our position is, it was clear there was a waiver, or excuse me, it was clear that there was a conflict, that the federal public defender had, that Mr. Silbert, the first assistant federal public defender, explained that to the court, that the record was developed in that fashion, that they actively represented another individual, that was seeking to get credit, on behalf of another person, who was providing information, that is boo, against defendant Lee, that they couldn't have stayed on in that case, that it is clear, we submit to the court, that the magistrate judge realized, there was a conflict, and that it was apparent to the judge, that the defendant wanted to keep Ms. Byrne, as his attorney, and it was, the court inquired into that, the court realized, saying it was a clear case of a conflict claim, it was a slam dunk, and that the court was not required, to have a waiver, and it's clear the defendant would have waited, if they brought him in. To say that there's an automatic reversal, in citing the Holloway case, and the Albany case, we submit those cases are distinguishable, from our particular situation. Here there was clearly an error, or a conflict, it was a conflict, that was apparent to all, and the, while the court did not, bring the defendant in, and ask for a waiver, those cases do not support the argument, that it was automatic reversal, in this case. So, all of a sudden, the, there was no money, to pay for a lawyer, all the money that they, made, selling all this stuff, they didn't have anything left, to hire, a lawyer, and they had to go to the, public defender, so. The public defender, did, defend Mr. Leedy, your honor. Yeah. That's correct. But they had no money. We, I wasn't, I don't know, we don't, of course, see the affidavits, that defendants, file, when they seek, appointed counsel, those are sealed, we don't see those. His, his, his brother, Henry Lee, was, I believe, represented also, by a CJA, a court appointed attorney, not the federal public defenders office, but a court appointed attorney. Well, they just want the best representation, so they want the public defenders office. They, had, an aggressive, Ms. Leary was an aggressive attorney, as is Mr. Ishibashi, I suppose I'm going outside the record, but to answer the court's question, they did have, our belief is, good counsel, competent counsel. Okay. Thank you, I'll submit your honor, unless there are further questions. Thank you. Your honor, in response to some of the court's questions, it's the government's burden to prove, that the Crawford error was harmless, beyond a reasonable doubt, and we've submitted case law saying, it's not harmless if there's any possibility, that the jury, could have relied on it. Exhibit six was the one, and this is, in the excerpts of record at 311 to 316, where Stewart had been talking about, exhibit six, that's where, Boo wanted to trade the Heineken beer sign, for a half an ounce, to, and Stewart said, no, no, he's not going to want to do it, but Boo said, yeah, I have come on to take the sign, and on the stand, Stewart said, that when Boo said, that he wanted to trade it for half an ounce, Boo meant crystal meth. The government did argue this in closing, but I would hope, Was that really, a serious dispute, and I understood the question was, who the identity of the other person was, when you're talking about half an ounce, you're probably not talking about gold, I mean, is it really disputed, as to whether it was an unlawful substance, that was being discussed? I've listened to a lot of these tapes, and it's probably not really disputed, but the government does has to prove it, if they say five plums, they mean, five ounces, or whatever, but the identity, Hard to interpret. Identity, is key. Is there anybody else, hanging around, who's called Kalani? There was another Kalani, which is the reason, that Judge Gilmore, said on the record, to Carice Stewart, could you please specify, which Kalani you're talking about, is it Kalani Lee, or is it the other Kalani? I did want to invite your attention, to excerpts of record, pages 216 to 17, which is where the government, did argue about Boo's statements, in it's closing argument, they said, quote, Boo's talking about, ellipsis, you got nothing, question mark, stuff, drugs, close quote, so there were, that's the sentence, that they used, and in the context, of the whole argument, they are arguing, Boo's statements, as substantive evidence, in addition, it was admitted, as substantive evidence, the jury didn't get to hear, the niceties of this argument, or it was just for context, the jury heard, that Stewart said, that Boo said, that Kalani Lee, was the man to go to, for the meth, and that's where, he wanted to, get it from, I think the government's, concession, that the reason, that they ended up, not calling Boo, is because, he was a government, I guess this is, counting up now, I apologize, it's because he was, not going to be, a good witness, that's what Crawford,  the 6th amendment, confrontation clause, allows defense counsel, to confront those guys, who are not going to be, good government witnesses, so I think the government, has failed in it's task, of convincing this court, that the jury was harmless, beyond a reasonable doubt, thank you. Now I've begun to think, that when these tapes, they tape up the informant, that this is testimonial, because it's intended, to be made, and presented in court, precisely, just like the Melendez Diaz,     and anticipation, of litigation, and anticipation, of litigation, and anticipation, of litigation, and anticipation, of litigation, and anticipation, of litigation, and anticipation, and anticipation, of catching, who they think is, the crook, and it is providing, if there were providing, context, then Ms. Stewart, could have just, testified from the stand, I agreed, that I would get, methamphetamine, and I decided, to go to, Kailuaali, to do it.    that they introduced it, and the reason, that they identified, Boo, as named Boo, because his name, was in the, evidence so it, had been found, in Kailuaali, is because he was, the second bit, of direct evidence, linking him to the crime. Thank you, your honor. Alright, matter is submitted, and, we'll go on, to the, next matter, which, is, next page, next page, I got to carry, next page, yeah, oh my god, I got it, here yeah, next page, Mark H. versus, Patricia, Alomero, et al. Next page,
judges: Fletcher B. , Pregerson, Clifton